1            UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NORTH CAROLINA

3   UNITED STATES OF AMERICA,        )
                                     )
4          Plaintiff,                )     DOCKET NO. 5:14-CV-00014-BO
                                     )
5      VS.                           )
                                     )
6   FOUR OAKS FINCORP, INC.,         )
    ET AL.,                          )
7                                    )
              Defendants.            )
8   _____ )

9

10              TRANSCRIPT OF HEARING ON COMPLAINT
            FOR INJUNCTIVE RELIEF AND CIVIL MONEY PENALTIES
                 BEFORE THE HONORABLE TERRENCE W. BOYLE
11              THURSDAY, JANUARY 9, 2014; 10:24 A.M.
                      RALEIGH, NORTH CAROLINA

12

13  FOR THE PLAINTIFF:
         United States Attorney's Office
14       By:  G. Norman Acker, III, AUSA
         310 New Bern Avenue, Suite 800
15       Raleigh, North Carolina  27601

16       United States Department of Justice
         Consumer Protection Branch
17       By:  Joel M. Sweet, AUSA
         450 Fifth Street, N.W., Room 6400 South
18       Washington, DC  20001

19
    Audio Operator:              COURT PERSONNEL
20

21       Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
22   _____

23            JANICE RUSSELL TRANSCRIPTS
                 1133 TANAGER TRAIL
24          VIRGINIA BEACH, VIRGINIA  23451
                   (757) 422-9089
25              trussell31@cox.net

1  **APPEARANCES** (Continued):

2  **FOR THE DEFENDANTS:**
        Smith Anderson
3        By:  Clifton L. Brinson, Esq.
              Geoffrey W. Adams, Esq.
4        150 Fayetteville St., Suite 2300
        Raleigh, North Carolina  27601
5
        Venable LLP
6        By:  Jeffrey D. Knowles, Esq.
        575 7th Street, NW
7        Washington, DC  20004

8

9  ALSO PRESENT:

10       LISA S. HERRING
        Four Oaks Fincorp, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  This is U. S. versus Four Oaks Financial

3    Corp.

4      So, Mr. Acker, what's the rush?  You showed up with

5    documents in hand sometime yesterday because "BO" ended up on

6    the file number, but it could have been any one of five other

7    Judges who could have been anywhere in or out of North

8    Carolina, in or out of this District.  And what possible

9    expectation did you have that you could stick it in front of

10   the view of a District Judge and you'd walk away with a

11   signature in the snap of a finger?  That, that would be the

12   most immediate thing that comes to my mind.

13          MR. ACKER:  Your Honor, we, we filed it.  We --

14          THE COURT:  Just blind hope that I wasn't on the road

15   or that it didn't go to Judge Howard and he was 500 miles away,

16   or --

17          MR. ACKER:  Absolutely, Your Honor.  It was -- we

18   filed it --

19          THE COURT:  So it couldn't be that important.

20          MR. ACKER:  Well, no, Your Honor.  We filed it.  We,

21   we figured out who the Judge was and --

22          THE COURT:  But you figured that out minutes before

23   you were at my door.

24          MR. ACKER:  Yes, Your Honor.

25          THE COURT:  Okay.

1          MR. ACKER:  That's right.  And whoever --

2          THE COURT:  Well, suppose it wasn't me.  What were you

3     going to do?

4          MR. ACKER:  We were going to contact whoever it was.

5     Our plan was whoever the Judge assigned to, we were going to

6     contact.

7          THE COURT:  Even if you couldn't get in front of the

8     Judge?

9          MR. ACKER:  Yes, Your Honor.

10          THE COURT:  Physically?

11          MR. ACKER:  Yes, Your Honor.

12          THE COURT:  Were you going to take a jet, a private

13     jet and fly down to hunt the Judge out?

14          MR. ACKER:  No, Your Honor.  We were just going to try

15     to get up with him in the best way we could.  We were prepared

16     to do a telephone conference.

17          THE COURT:  And hope that the Judge would just sign

18     it?

19          MR. ACKER:  We were hoping to be, to make ourselves

20     available to answer any questions that the Judge had in hopes

21     that it could be done expeditiously, yes, Your Honor.

22          THE COURT:  Wow.

23          MR. ACKER:  And, and part --

24          THE COURT:  That's -- I see that as being as

25     unrealistic as I can imagine.

1        MR. ACKER:  We simply wanted to, to bring it to the

2   court's attention as soon as we can.  I think the --

3        THE COURT:  But you didn't put anything on the papers

4   that said, "Emergency.  Life and death.  Expedite," or anything

5   that would have triggered some idea that this was a crisis.

6        MR. ACKER:  Your Honor, our -- our plan was -- because

7   it was a consent order that was being filed simultaneously with

8   the complaint and because both parties were in agreement that

9   this consent order was in the, in the interest of the parties

10  and in the public interest, we --

11       THE COURT:  You could cut the court out?

12       MR. ACKER:  No.  No, Your Honor.  We wanted to make --

13  we wanted to make sure the court was aware as soon as we could

14  so the court could consider it.  And that's why we did what we

15  did.

16       THE COURT:  And so your plaintiff is the United

17  States, but really, the Department of Justice?

18       MR. ACKER:  Yes, Your Honor.

19       THE COURT:  It's not the Federal Reserve or the FDIC

20  or the Comptroller of the Currency or the Treasury Department

21  or any bank regulatory entity, is it?

22       MR. ACKER:  Well, those -- no, Your Honor.  The

23  plaintiff is the United States of America and the Department of

24  Justice has a --

25       THE COURT:  And -- that's because it's a quasi-

```
 1   criminal matter?

 2           MR. ACKER:  The -- one of the statutes we're going

 3   under is in Title 18 and it provides for an injunction against

 4   fraud and --

 5           THE COURT:  Criminal behavior.

 6           MR. ACKER:  Yes, Your Honor.

 7           THE COURT:  It's wire fraud, is what --

 8           MR. ACKER:  Yes.

 9           THE COURT:  -- you're talking about.

10           MR. ACKER:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MR. ACKER:  And the other is a --

13           THE COURT:  So does that mean you've got a Grand Jury

14   going, or you can't tell me that?

15           MR. ACKER:  I can't talk about that in open court,

16   Your Honor, except to say that the proposed consent order does

17   provide that the Bank will as part of the order cooperate with

18   any ongoing investigations.  And I think --

19           THE COURT:  So -- and you can't tell me, either, if

20   this is a deferred prosecution kind of activity?

21           MR. ACKER:  The consent order specifically says that

22   it does not settle or waive any rights for any criminal

23   prosecutions of, of anyone.

24           THE COURT:  Now you know all about this.  You're good

25   at, on the facts, or not?
```

1          MR. ACKER:  I brought co-counsel with me who is much

2     more familiar with the facts, Mr. Joel Sweet from the

3     Department of Justice in Washington.

4          THE COURT:  And what section are you in?

5          MR. SWEET:  Good morning, Judge.

6          THE COURT:  Good morning.

7          MR. SWEET:  Joel Sweet.  I'm actually an Assistant

8     U. S. Attorney from Philadelphia.

9          THE COURT:  Okay.

10          MR. SWEET:  I'm detailed to Washington.

11          THE COURT:  Okay.  Where, where is your --

12          MR. SWEET:  We're in --

13          THE COURT:  -- spot?

14          MR. SWEET:  I'm detailed to the Consumer Protection

15     Branch, which is a part of the Civil Division of --

16          THE COURT:  Okay.

17          MR. SWEET:  -- the Department.

18          THE COURT:  Okay.

19          MR. SWEET:  And we have both criminal and civil

20     jurisdiction over certain categories of areas and this is one

21     of them.  And this was our investigation and we've joined with

22     the U. S. Attorney's Office here to bring it.

23          And, Your Honor, to answer a question that you raised

24     earlier, we want the court to be fully comfortable with the

25     status of this, what happened before, what happened after,

1  where it fits in the big picture.

2        THE COURT:  Well, that's how you get my signature.

3        MR. SWEET:  Well, Your Honor, we want you to be

4  satisfied that it's a fair, reasonable, and adequate settlement

5  and that Your Honor is comfortable with the, with putting your

6  signature on it if the court --

7        THE COURT:  Yeah.  Well, I'm not going to sign

8  something that I'm not comfortable with.

9        MR. SWEET:  Absolutely.

10        THE COURT:  Yeah.

11        MR. SWEET:  And that is why --

12        THE COURT:  That's the whole idea.

13        MR. SWEET:  And that is why, Judge, we have brought it

14  as a consent decree to have Your Honor's approval as opposed to

15  a private settlement agreement which would have been an

16  alternative that would --

17        THE COURT:  Sure.

18        MR. SWEET:  -- that would have cut the court out.

19        THE COURT:  Sure.

20        MR. SWEET:  And we don't want to cut the court out and

21  we'd like Your Honor to consider all the facts.  We'd like to

22  answer all your questions.  The questions concerning whether,

23  where it fits in larger investigations or other investigations,

24  as Mr. Acker said, we cannot discuss in open court.  If Your

25  Honor is interested in that and wants more information about

1    that before making a decision on the consent decree, we'd be

2    happy to speak to Your Honor ex parte in camera.

3          THE COURT:  Well, I'm not going to do that.  I mean,

4    I'm not going to get involved in some sort of ex parte -- I'm

5    not here as a Star Chamber, but I'm going to ask the questions

6    that I feel are compelled.

7          MR. SWEET:  Absolutely, Your Honor.  We're, we're here

8    to answer and so are the Bank's counsel.

9          THE COURT:  Yeah.  And so you know a lot about this

10   Bank --

11         MR. SWEET:  I do.

12         THE COURT:  -- and a lot about this activity?

13         MR. SWEET:  I do.

14         THE COURT:  Okay.  This is a -- where is the charter

15   for this Bank?  Where does it come from?

16         MR. SWEET:  It's a state-chartered bank.

17         THE COURT:  Okay.  So the state banking regulatory

18   agency has issued a charter for this Bank?

19         MR. SWEET:  That's correct, North Carolina.

20         THE COURT:  And who do you -- and they have federal

21   insurance?

22         MR. SWEET:  They have federal insurance and --

23         THE COURT:  So they're under the FDIC and they

24   participate in the Federal Reserve system?

25         MR. SWEET:  Yes, they do.

1          THE COURT:  Okay.

2          MR. SWEET:  And their, their primary federal regulator

3  is the Federal Reserve Bank of Richmond.

4          THE COURT:  Right.

5          MR. SWEET:  So that is the region and that is their

6  primary regulator.

7          THE COURT:  And the FDIC?  Doesn't it have

8  administrative regulatory interest involved?

9          MR. SWEET:  It does, but I believe the FDIC in this

10  case is a secondary regulator, correct?

11      (Inaudible response.)

12          THE COURT:  Okay.  And so the Federal Reserve Bank in

13  Richmond is the federal access or federal review?

14          MR. SWEET:  Yes.  It's the primary federal regulator

15  as opposed to the OCC or the FDIC.

16          THE COURT:  Yeah.

17          MR. SWEET:  The banks have choices, in some respects,

18  of who their regulators will be.

19      Your Honor, in reaching --

20          THE COURT:  And this is a private bank?  It's not

21  owned by any other Bank?

22          MR. SWEET:  It is publicly held.

23          THE COURT:  Yeah.

24          MR. SWEET:  It's not owned by another bank.  Four Oaks

25  Fincorp is a holding company.

1          THE COURT:  Okay.

2          MR. SWEET:  And they own the Bank, itself.  The Bank

3    is an old, established bank.

4          THE COURT:  Yeah.

5          MR. SWEET:  It's been around since the earlier part of

6    the last century.

7          THE COURT:  Yeah.  I've had other litigation involving

8    this Bank I recall from memory, but I haven't been able to put

9    my finger on it in the last four to ten years.  Somebody else

10   may remember, but it involved stock and a pledge of stock by

11   the Bank, what I -- I haven't looked for the file yet.

12      But anyway, I'm familiar with where the Bank is.

13         MR. SWEET:  Yeah.  And, Your Honor, the only activity

14   we're looking at with this Bank is what's alleged in the

15   complaint.

16         THE COURT:  Yeah.

17         MR. SWEET:  We have no other concerns.

18         THE COURT:  So, so this entity with a lot of "Ps" and

19   a few "Ts" is a clearing house, like PayPal kind of entity?

20         MR. SWEET:  No, Your Honor.  It's a different sort of

21   animal and it's -- this is an area that's emerged in the last

22   six or seven years to be a, these third-party payment

23   processors, to have a role in the payment system, which, in

24   some particular cases, can create enormous risks for banks and

25   for consumers.  This is really a --

1     THE COURT:  Let's hypothetically say that I've got a

2  job and my employer pays me every two weeks and I'm broke and I

3  want to call up or access a payday lender and I make a thousand

4  dollars every two weeks and I need to borrow $800 now.  And so

5  how do I get to my payday lender and PPPT?  How do I get

6  involved with them?

7     MR. SWEET:  Sure.  Let me give you an example, Your

8  Honor.

9     THE COURT:  How about my example?  Is that a bad

10 example?

11    MR. SWEET:  Yeah -- no.  Let me use your example and

12 apply it in the courtroom so it might make, it'd be easier for

13 me to explain and I'll be happy to answer any questions.

14   If I'm the payday lender and you want --

15    THE COURT:  I'm the borrower.

16    MR. SWEET:  -- and Your Honor is the borrower --

17    THE COURT:  Yeah.

18    MR. SWEET:  -- they're the bank and they have access

19 to the payment system.

20   So for me to give you money or for Your Honor to, for me to

21 get money back, I have to go through a banking system in order

22 to just have the money moved.  And they're, they're the place

23 it has to happen.  The bank is the access to the system, but if

24 I'm a payday lender and I knock on the door of a bank, even

25 Four Oaks Bank, and say, "I'm an Internet payday lender.  This

1    is the kind of business I do.  These are my contracts.  This is

2    what I want to charge in interest and this is how I do my

3    business," that bank is virtually certain to say, "No.  We're

4    not opening an account for you.  We're not putting money into

5    people's accounts.  We're not withdrawing money from people's

6    accounts.  We're not doing that."

7             THE COURT:  Because the Fed won't let them?

8             MR. SWEET:  Because the regulations and the guidance

9    to banks about --

10             THE COURT:  From the Fed?

11             MR. SWEET:  -- risk --

12             MR. SWEET:  From the FDIC, the Fed --

13             THE COURT:  Okay.

14             MR. SWEET:  -- the OCC.

15             THE COURT:  And the State Banking Commission?

16             MR. SWEET:  And the State Banking Commission,

17    especially the State Banking Commission.

18             THE COURT:  Says, "If you engage in these kinds of

19    practices, you have a high-risk activity and you're going to be

20    a bank that's unstable"?

21             MR. SWEET:  It's -- exactly.  It would be considered

22    an extremely high-risk customer, high-risk activity that

23    threatens the bank both legally, reputationally, and

24    financially.

25         So -- in addition, Your Honor --

1        THE COURT:  So in order to do it, if you want to do it

2   and you want to collect a fee for doing it, you have to set up

3   a dummy.

4        MR. SWEET:  That's right, Your Honor.

5        THE COURT:  And the dummy is PPPT?

6        MR. SWEET:  Since we're lined up this way I'll say

7   that Mr. Acker would serve as the third-party payment

8   processor.  So I would have is a lender --

9        THE COURT:  So it's a straw transaction, more or less?

10       MR. SWEET:  Well, I wouldn't say "straw" because --

11       THE COURT:  No.

12       MR. SWEET:  -- everybody --

13       THE COURT:  It's a dummy transaction where it goes

14   through there and it gets sanitized.

15       MR. SWEET:  Your Honor, I wouldn't want to call it

16   that because the bank knows who the, who I am except they don't

17   want to have, they don't want to touch me.

18       THE COURT:  It's almost like a money-laundering kind

19   of thing.

20       MR. SWEET:  It's, it's a money transmitter.

21       THE COURT:  Okay.

22       MR. SWEET:  And I would suggest that your analogy is

23   apt, but where the bank would not be willing to do business --

24       THE COURT:  So if you were a big-time Mexican cartel

25   drug trafficker and you said, "I have hundreds of millions of

1   dollars, but they're all in cash and I need to put them into

2   credit," you couldn't go to the bank and say, "I want to open

3   an account and make this deposit," but you could go to PPP&T

4   and say, "Here's $10 million.  Open an account in my favor,"

5   and then put it in Four Oaks Bank.

6            MR. SWEET:  It's a type -- that's a type of activity,

7   Your Honor.  If it's -- the bank is able to do business with me

8   through an intermediary where it could not do business with me

9   directly.  And --

10           THE COURT:  Yeah.  Who --

11           MR. SWEET:  -- in addition, Your Honor --

12           THE COURT:  Who owns payday lenders?  I mean, is it

13  the mob?  Is it the Mexican cartel?  Is --

14           MR. SWEET:  That's a great question.

15           THE COURT:  You know?  Because if this was the '40s

16  I'd know who owned it.  They were all on The Untouchables or on

17  the later Sopranos.

18           MR. SWEET:  Your Honor, the payday lending industry --

19  and I don't want to speak with generalities --

20           THE COURT:  Well, go ahead.  I'll --

21           MR. SWEET:  -- but there is the payday lending

22  industry that's brick and mortar that's regulated where you go

23  to a storefront --

24           THE COURT:  Yeah.

25           MR. SWEET:  -- and people go in and, for the most

```
 1  part, those entities are known.
 2          THE COURT:  Yeah.
 3          MR. SWEET:  The owners are known.
 4          THE COURT:  Yeah.
 5          MR. SWEET:  They're legal.
 6          THE COURT:  Yeah.
 7          MR. SWEET:  Even if you might not like it --
 8          THE COURT:  Right.
 9          MR. SWEET:  -- we're -- we're not -- we're not -- you
10  know, we're not here telling people what you should do and
11  what's --
12          THE COURT:  Right.
13          MR. SWEET:  -- good for you.
14          THE COURT:  Even if you don't think 60 percent a month
15  in interest is healthy.
16          MR. SWEET:  If it's, if it's legal, it's your right to
17  do it.
18          THE COURT:  Yeah.
19          MR. SWEET:  What the Internet payday lending world is
20  about --
21          THE COURT:  Yeah.
22          MR. SWEET:  -- is anonymity.
23          THE COURT:  Yeah, but they could be offshore.  They
24  could be in Nigeria.  They could be in the Philippines.  It
25  could be anywhere.
```

1    MR. SWEET:  Or, or more so, Your Honor, they can be in

2    Philadelphia and say that they're in the Philippines.

3        THE COURT:  Yeah.

4        MR. SWEET:  And, therefore, if they are hauled into

5    court, they're a foreign company and they're not subject to

6    U. S. laws, they would say.  Now most states would say, many

7    states would say that, "If you're doing business in our state"

8    -- and I think North Carolina is one of them -- "then you have

9    to abide by North Carolina law."

10        THE COURT:  So the Internet payday lender is

11   anonymous --

12        MR. SWEET:  Absolutely.

13        THE COURT:  -- and their resources are unknown.

14        MR. SWEET:  Their resources are significant, but --

15        THE COURT:  Yeah, but they're unknown.

16        MR. SWEET:  They're unknown.

17        THE COURT:  They could be in the millions or tens of

18   millions or hundreds of millions of dollars.  They don't know.

19        MR. SWEET:  Absolutely, Your Honor.

20        THE COURT:  And the source could be from anything,

21   from legal, illegal.  It could be a way of washing money.  It

22   could be over, you know, foreign currency.

23        MR. SWEET:  The source of the money, you're --

24   absolutely, Your Honor.  It -- could be any, anything.  Could

25   be the source of the money and whether taxes are paid on that

1  money, how much money is taken, all of that is -- the activity

2  of the Internet payday lender is virtually anonymous and --

3  THE COURT:  And this gets injected into our banking

4  and credit system by the introduction of an amount of money to

5  a borrower unsecured with a pledge of the borrower's pay.

6  MR. SWEET:  It's a pledge of the borrower to pay.

7  THE COURT:  No.  Of the borrower's wage.

8  MR. SWEET:  Of his wage.

9  THE COURT:  Yeah.

10  MR. SWEET:  Now because it's no collateral and because

11  it's no --

12  THE COURT:  Enforcement mechanism to collect the wage.

13  MR. SWEET:  Yeah.  And -- and --

14  THE COURT:  I mean, you can't garnish the wage.

15  MR. SWEET:  And frankly, Your Honor, if it's a North

16  Carolina resident who has this type of loan and they refuse to

17  pay the loan, that Internet payday lender cannot bring suit in

18  North Carolina --

19  THE COURT:  Right.

20  MR. SWEET:  -- against that resident because that loan

21  is unlawful.

22  THE COURT:  Yeah.

23  MR. SWEET:  So they have no way to take people's money

24  back other than automatically getting --

25  THE COURT:  Debiting it.

1          MR. SWEET:  -- purported preauthorization --

2          THE COURT:  Yeah.

3          MR. SWEET:  -- which is violations of other statutes.

4          THE COURT:  But the money has to get into the account

5  before the debit can work.

6          MR. SWEET:  That's right.

7      So what I will do as a payday lender is when Your Honor

8  asks for that loan for $800 I will authorize that debit and I

9  will send a notice to my processor to originate the ACH

10  deposit, a credit, that will go to the bank, will go under the

11  bank sponsorship through the Federal Reserve system, you will

12  find $800 in your account.  Then I will, I will, based upon the

13  purported agreement or what we allege fraud in terms of how it

14  operates, I will then start debiting your account and I will do

15  it by sending an instruction to my third-party processor to

16  start to debit your account.

17          THE COURT:  And you're debiting it for interest first.

18          MR. SWEET:  Exactly, Your Honor.

19          THE COURT:  And the interest may eat up the debit?

20          MR. SWEET:  What we're finding, Your Honor, is that --

21          THE COURT:  And so the principal just remains or is

22  added to by the delinquent interest.

23          MR. SWEET:  Now most borrowers based upon the

24  representations on the websites they see and even on the

25  contracts -- in some cases the, the consumer doesn't see the

1  contract -- but they all believe that there is going to be a --

2  Your Honor would see that you're going to pay -- you borrowed

3  $800 and in two weeks you're going to have $900 withdrawn from

4  your account.

5      But what happens is they won't withdraw $900 on one day.

6  They'll withdraw $400 in two weeks and it will be applied to

7  principal and you'll keep on getting debited over and over and

8  over and over.  And we had examples in the complaint, Your

9  Honor, where -- and this happens regularly to vast numbers of

10 people -- that $800 eventually three months down the line has

11 cost you $1200 or $1400 and you still have a $600 principal

12 owed.  Now --

13      THE COURT:  And at the first debit the borrower says,

14 "Wow.  I dodged a bullet.  Instead of them taking all the

15 money, they just took some of the money.  So I'm healthy, right

16 now."

17      MR. SWEET:  And, Your Honor, there are -- buried into

18 the documents -- we've read hundreds of these contracts --

19 provisions by which a -- we don't, we don't want to speak in

20 generalities, but there are ways for you, possibly, to avoid

21 that trap, but it's not something that you will know how to do

22 or be able to do.

23      THE COURT:  The unsophisticated customer is not going

24 to know how to do it.

25      MR. SWEET:  Even the sophisticated customer, Your

1    Honor.  You know, sending a letter that's, that reaches the

2    payday lender two days before the deadline, it's not practical.

3    Usually, it's not known unless you have the contract itself and

4    it's long beyond any deadline, but money now is coming out of

5    your account on a regular basis and you're saying, "What's

6    going on?  I borrowed 8.  I've paid 14 and they say I still owe

7    5."  And then, Your Honor, when you're, when you finally close

8    your account or when you're, you are literally --  we use the

9    word in the complaint "bled dry" -- you have nothing left.

10   'Cause these people, for the most part, are working-class

11   people.  These are not the poor people.

12               THE COURT:  Right.

13               MR. SWEET:  These are not or the people who have

14   nothing.  Because they'll never --

15               THE COURT:  'Cause they can't access food stamps and

16   other support.

17               MR. SWEET:  Well -- well, unless you show that you

18   have an income --

19               THE COURT:  Yeah.

20               MR. SWEET:  -- and you're a working person --

21               THE COURT:  Yeah.

22               MR. SWEET:  -- you don't get the loan in the first

23   place.

24               THE COURT:  Right.

25               MR. SWEET:  So what this, these schemes target is,

1    really, middle class and lower middle-class people who are

2    trying to --

3           THE COURT:  Wage earner.

4           MR. SWEET:  -- get by.

5           THE COURT:  Wage earners.

6           MR. SWEET:  Wage earners who, who have jobs, who are

7    trying to get by and often --

8           THE COURT:  How about illegals?  Are they brought into

9    the picture?  Because they don't have a Social Security number

10   and they may not have a checking account.  But if they had a

11   checking account, is that all you need?

12          MR. SWEET:  Your Honor, I don't know.  I think that

13   would be a case-by-case determination of whether a lender would

14   be willing to make an initial loan to someone who, who doesn't

15   have documentation.  I don't know whether the lender would know

16   that or --

17          THE COURT:  What does the lender require, a driver's

18   license or a Social Security number, or what?

19          MR. SWEET:  Usually, a W-2 form, Social Security,

20   name, address.

21          THE COURT:  Well, unless they're off budget, unless

22   they're under-the-table pay, they're going to get a W-2.

23          MR. SWEET:  That's correct, Your Honor.

24          THE COURT:  I mean, North Carolina is full of

25   industries that are employing people who are here illegally,

1    but they are on the books as employees.

2            MR. SWEET:  That's a good point, Your Honor.  I

3    never --

4            THE COURT:  They have comp.  They get --

5            MR. SWEET:  Your Honor, I never really looked at that

6    issue.  It's an interesting issue, Your Honor.

7            THE COURT:  Yeah.  I mean, they -- I mean, we had a

8    roundup here, one of the pork producers ten years ago -- and I

9    did it -- and they just bringing them in by the bus.  There

10   wasn't a single person on the line who, I mean, chicken,

11   turkeys, pork, you name it -- eastern North Carolina's is the

12   motherload of processing -- there isn't a person in there who's

13   got legal documentation.

14           MR. SWEET:  Yeah.  Your Honor, it's interesting you

15   raise that.  There was a case we had against a bank up in

16   Philadelphia, a criminal case, where -- obviously, I want to be

17   clear.  Not Four Oaks Bank, had nothing to do with Four Oaks

18   and we're not alleging that kind of conduct --

19           THE COURT:  Yeah.

20           MR. SWEET:  -- here -- where the bank had an agreement

21   with a number of its customers who are employers where if a

22   person came in wearing the T-shirt for that employer they

23   would --

24           THE COURT:  That would I.D. them?

25           MR. SWEET:  They wouldn't otherwise I.D. them and they

1  would cash their paychecks.

2          THE COURT:  Yeah.

3          MR. SWEET:  And the question was whether the bank was

4  complicit in some type of illegal conduct by --

5          THE COURT:  Yeah.

6          MR. SWEET:  -- helping and assisting the cashing of

7  these checks for, that were for illegal employment.

8          But that's another issue.

9          THE COURT:  Yeah.

10         MR. SWEET:  I just raise it, Your Honor, since you --

11         THE COURT:  Yeah.

12         MR. SWEET:  -- you raise that question.

13         THE COURT:  Yeah.

14         MR. SWEET:  So we don't know if that -- we don't have

15  any, any allegations or anything of that nature there with

16  regard to immigration status.

17      We know that our victims, for the most, or virtually all of

18  them, are, we've seen school principals and we've seen 7-11

19  clerks.

20         THE COURT:  So who initiates the contact with Four

21  Oaks?  Is it the PPPT people, the intermediary -- they're

22  surfing and bottom fishing for a friendly bank -- or is it the

23  PayPal, the lender?

24         MR. SWEET:  No.

25         THE COURT:  It's --

1        MR. SWEET:  Your Honor, the lender looks for a payment

2    processor that happens to be able to maintain a bank

3    relationship.

4        THE COURT:  Okay.  And -- and so that's the PPPT

5    people from Texas?

6        MR. SWEET:  The Holy Grail for a payment processor is

7    a bank that's willing to do business with them --

8        THE COURT:  Okay.

9        MR. SWEET:  -- and their merchants.

10        THE COURT:  And turn a blind eye?

11        MR. SWEET:  Yeah.

12    And, Your Honor, as we describe in the complaint, there are

13    a whole lot of federal regulations that come out of the Patriot

14    Act that require a bank to know if, know who its customers are,

15    to really understand them, and to know who the principals are,

16    and to be assured that there's no illicit conduct that their

17    customer is engaged in.

18        THE COURT:  So if go to Wells Fargo, they've got a

19    screening mechanism and they're going to kick you out and tell

20    you, "Don't come to us"?

21        MR. SWEET:  Absolutely.

22        THE COURT:  If you go to the Farmers Bank of Sunbury

23    and they still don't have a computer, they're liable to say,

24    "Yeah.  How much is the fee that you're willing to pay?"

25        MR. SWEET:  Your Honor, I'll give Four Oaks credit.  I

1    would imagine that if any of the payment processor's merchants

2    knocked on the door of Four Oaks Bank and said, "We'd like to

3    do business with you and have an account and debit people's

4    accounts," Four Oaks Bank probably would have said, "No way.

5    We're not getting close to you."  However, they will do

6    business with the payment processor and look the other way.

7    And that's what happened here, is the signs of fraud were just

8    glaring.

9              THE COURT:  Yeah.

10             MR. SWEET:  And as long as they felt removed from it

11   and we're only looking at the payment processor --

12             THE COURT:  So this --

13             MR. SWEET:  --- they --

14             THE COURT:  -- processor isn't running a hundred

15   percent of their business through Four Oaks Bank.  They're

16   accessing banks all over America, probably.

17             MR. SWEET:  Your Honor, in this particular case we

18   only know of one at this moment -- and I don't want to go too

19   far into this -- but at this moment we're not aware of this

20   particular processor having any other bank relationships and

21   the Bank may have, counsel for the Bank may have more knowledge

22   about that.  We know that the, this particular processor has

23   been on notice for months that, that this day was coming and

24   they certainly have the right, like any other company, to go

25   out and find a bank that's willing to do business with them.

1  The fact that most banks won't is not the Government's doing

2  and it's not Four Oaks Bank's doing.

3        THE COURT:  Well, payday lending -- let's go back to

4  the Internet -- payday lending is a escalating crime or plague

5  on the country, on the economy, you would -- you'd have to

6  agree.  It's not going down.  It's going up.

7        MR. SWEET:  Well, Your Honor, I'm not sure which way

8  it's trending right now.  There are a lot of financial

9  institutions that are taking steps to avoid working with high-

10 risk merchants of all types.  And, Your Honor, we're looking

11 at, we're looking at fraud here.  We're looking -- there's a

12 lot of telemarketers, there are a lot of Internet scammers,

13 there are a lot of fake pharmacies and offshore Indian

14 pharmacies, all of these companies involved in those types of

15 illicit conduct when they, when they are working in illicit

16 conduct, okay?  Not everything is illicit, but where it is

17 criminal all of them are trying to find access to the U. S.

18 banking system --

19        THE COURT:  Yeah.

20        MR. SWEET:  -- so they can get people's money.

21        THE COURT:  So what I was going to suggest is Four

22 Oaks isn't alone in the country in doing this.  There must be

23 other banks in other states that have, repeat the same

24 experience.

25        MR. SWEET:  We're looking for every one of them.

1        THE COURT:  Yeah.  And they're typically little mom-

2   and-pop kind of banks?

3        MR. SWEET:  Your Honor, my first, my first case of

4   this nature was a payment processor in Philadelphia.  The six

5   principals of the payment processor were involved and sentenced

6   and several of them are still in, serving time.  This is in 19,

7   2006.  They had -- it wasn't payday lending.  It was all sorts

8   of telemarketing fraud.  They were working through Wachovia

9   Bank.  Wachovia had four massive payment processors, each with

10  hundreds of merchants, and they were doing enormous -- in my --

11  the particular first case I had there was $160,000 million of

12  attempted debits against consumers' accounts in 11 months.

13       THE COURT:  How does the bank make money, on a fee

14  basis?

15       MR. SWEET:  On a fee.

16       THE COURT:  And the fee is based on the amount of the

17  debit?

18       MR. SWEET:  Good question, Your Honor.  Two bases:

19  They, they take a fee in the same way that it happened in Four

20  Oaks.  They take a fee on the forward transaction and they also

21  take a fee on the return.

22       THE COURT:  Just like a $2 fee like you get at the

23  ATM?

24       MR. SWEET:  Could be 10 or $15 on the return.  Because

25  a forward transaction is a, is a normal transaction, but a lot

1  of these transactions as they flow through the system -- and

2  we'll use Your Honor's example where you're the consumer where,

3  and your deputy, say, is your, is your bank -- that transaction

4  hits your, hits your bank.

5        THE COURT:  That's where the money's going.

6        MR. SWEET:  Yeah.

7        THE COURT:  But the money is coming into my bank in

8  the account?

9        MR. SWEET:  Yes, but when, when there's a request for

10  a debit and it travels from me, the processor, through the

11  Federal Reserve system, and hits your bank --

12        THE COURT:  Yeah.

13        MR. SWEET:  -- very often your bank will reject it.

14        THE COURT:  Say, "Whoa, stop."

15        MR. SWEET:  They'll return it as unauthorized, or for

16  many other different types of reasons.  That leads us into one

17  of the big red flags, Your Honor, is, is returns and

18  chargebacks.  And what we have here is situation where the

19  average return for unauthorized is -- it's in our papers -- but

20  it's .0 something of total return.

21        THE COURT:  Yeah.

22        MR. SWEET:  And if there are too many returns or total

23  returns or unauthorized returns or different categories which

24  we -- I can -- happy to answer Your Honor's questions if you

25  have any more questions on the types of returns -- high levels

1    of returns are plainly indicia of fraud.  Every bit of banking

2    regulation for a long time has said this, more than ten years,

3    if a bank sees high rates of return -- and we're talking a half

4    a percent, 1 percent, 2 percent -- there's a possibility that

5    the merchant is defrauding consumers.

6         Now in the Visa-MasterCard world where, where a merchant

7    has returns of over 1 percent, Visa and MasterCard will call

8    that merchant and say, "Whoa.  You're doing something wrong

9    here.  You're on the watch list and if you don't bring the

10   return level down, you're out.  You're out of our system."

11        In the ACH world, the regulatory entity has a threshold

12   currently at 1 percent for unauthorized returns.

13        It's about to -- there's a proposal out to have a 15

14   percent threshold for total returns.  In other words, Your

15   Honor, if a store had, it was selling a product and 15 percent

16   of the time that it tried to do a transaction it got reversed,

17   there'd be a problem and it's a known problem and the industry

18   is quite aware of it.  These merchants that we're talking about

19   had return rates of 30 or 40 percent, at least.  We've seen

20   cases where it's 60 or 70 percent.  Any bank should immediately

21   see that and say, "There is something wrong here.  We got to

22   make this stop."  However, the bank profits on every one of

23   those returns and they profit a lot more on the return than

24   they do on the forward.

25             THE COURT:  Who do they get the money from on the

1 | return?

2 | MR. SWEET: Well, Your Honor, they get -- the charge

3 | that the bank pays, the processor pays --

4 | THE COURT: Okay.

5 | MR. SWEET: -- and then, ultimately, it comes back to

6 | me, the lender or the merchant.

7 | THE COURT: Yeah.

8 | MR. SWEET: But if I'm ripping people off, if I'm a

9 | telemarketing merchant, not a -- not a -- let's leave payday

10 | lending aside --

11 | THE COURT: Yeah.

12 | MR. SWEET: -- I'm a fraudulent telemarketer and I'm

13 | calling you up and getting you to pay 3.99 for something that

14 | doesn't exist --

15 | THE COURT: Right.

16 | MR. SWEET: -- I don't mind paying a $15 return.

17 | THE COURT: Okay. Yeah, 'cause you got nothing in.

18 | MR. SWEET: I've got a pretty good margin.

19 | THE COURT: Right, right, right, right.

20 | MR. SWEET: That's how the system works.

21 | So, so the bank would immediately know from these return

22 | levels that there's definitely a problem and then you're

23 | getting affidavits back from, from banks saying, you know, "I'm

24 | Judge Boyle. I declare under penalty of perjury that the $200

25 | they took out of my account was not authorized." They're

1 getting hundreds or thousands of these. They -- at one point

2 this particular bank stopped recording them because there were

3 so many. So they just loaded them up.

4  I don't want to talk about the particular bank because

5 that's really not, unless Your Honor wants to hear more about

6 the specific allegations, but I'm sure Your Honor's familiar

7 with the complaint. This is some background.

8  So the, the bank sees these enormously high return rates,

9 which every bit of banking regulations says it's a red flag, a

10 fraud, they're getting complaints from other banks saying, "Why

11 are you doing this when people are saying they're not

12 authorized"? And -- and every -- and every -- and they're

13 profiting from it. They're getting big fees.

14   THE COURT: Well, how much was the take at Four Oaks

15 in, over the life of this relationship?

16   MR. SWEET: The total revenue -- and again,

17 information we received from the Bank and we accept that as, as

18 accurate, consistent with the findings we've had -- is

19 somewhere between 8 and $900,000 of total revenue.

20   THE COURT: Over what period of time?

21   MR. SWEET: 2009 to the present.

22   THE COURT: That's, that's not a lot of money for a

23 bank. I mean --

24   MR. SWEET: It's, it's not a lot of money, you would

25 say, given the amount of money that's passing through the Bank,

1  you would say it's not a lot of money.  And I agree with you.

2  In the case with the bank, with Wachovia, it made $1.8 million

3  over 11 months for $165 million of debits.

4           THE COURT:  Yeah.

5           MR. SWEET:  There's a cost-benefit ratio that every

6  bank goes through and for this particular bank -- and I'll let

7  the Bank's counsel speak more directly to this -- in this

8  particular bank's situation, given the economy and it's last

9  few years of performance --

10          THE COURT:  It was a profit center?

11          MR. SWEET:  This was an important profit center.

12          THE COURT:  Okay.

13          MR. SWEET:  In addition to having the income from

14  fees, they also had high levels of deposits --

15          THE COURT:  As a result of this.

16          MR. SWEET:  -- because the money from, coming back and

17  forth sat in their accounts.

18          THE COURT:  Yeah.

19          MR. SWEET:  So it gave them capital to work with.  And

20  -- so there were two benefits.  And I'm not a banker and the

21  Bank has a representative here and counsel here.  So I'd rather

22  leave, Your Honor, if it's okay, I'll leave the Bank's

23  presentation to the Bank -- but I'd be happy to answer any more

24  questions about how this system works.

25          THE COURT:  The, the whole enterprise, not just this

1  payday lender, this particular one, but the Internet credit

2  enterprise is in the billions of dollars.

3          MR. SWEET:  The -- I'm sorry.  Which --

4          THE COURT:  Well, the, the process that you're talking

5  about, the telemarketing and --

6          MR. SWEET:  Oh.  Absolutely, Your Honor.

7          THE COURT:  Yeah.

8          MR. SWEET:  Tens of billions of dollars.

9          THE COURT:  Yeah.

10          MR. SWEET:  And I'll say, Your Honor, that, that we

11  have several government agencies -- and I wish I could say that

12  every government agency was highly effective in all cases.  I

13  can't because they're not and I'll be the first to admit

14  that -- but we have the Federal Trade Commission works awfully

15  hard going after scammers.  The -- there are a number of

16  federal agencies and law enforcement agencies that are

17  constantly chasing down the originators of these schemes and,

18  and we're trying to do our best.  DOJ goes after them all the

19  time, but many of those schemes disappear, they're partly based

20  offshore, and they re-emerge under different names.

21          THE COURT:  Yeah.

22          MR. SWEET:  And it's, and it's very difficult,

23  particularly, Your Honor, where it's a telemarketing scammer

24  where the call might be coming from Canada and, say, we, we get

25  the perpetrators in court, Your Honor, before Your Honor for

1  trial and, and the victim often has no idea who they spoke to

2  or even when they spoke.

3          THE COURT:  No.  I've sentenced people in those

4  Canadian telephone fraud things.

5          MR. SWEET:  So I have nothing I can -- I can --

6  nothing to inform you, Your Honor, because I'm sure you're much

7  more familiar with these problems than I am with how it plays

8  out justice-wise, but the complicit actors in the banking

9  system is another story and, and, you know, we strongly believe

10  that where there are actors, whether it's a processor or a bank

11  that knows that it's facilitating fraud against consumers, we

12  have a responsibility and a duty and the right to pursue them

13  and use the appropriate statutes to find a fair and just way

14  of, of not only stopping that fraudulent system, but also

15  creating deterrents for others so they, so they're aware that

16  they, they do have risks if they engage in this activity.

17          THE COURT:  I mean, one of the first thoughts I had is

18  what consequences does the Bank have other than entering into

19  an injunction?  Isn't this the kind of thing where their

20  charter could be revoked or they could be put on a suspended

21  list or put on a watch list or something like that?

22          MR. SWEET:  Well, Your Honor, a criminal charge would,

23  would potentially cause a revocation of their charter and would

24  be an existential threat, I can say, to the Bank.  In this

25  particular situation, we believe that the, the regulators and

1  the State will take serious, take a serious look at what this

2  means for the Bank.  And I don't want to speak for the

3  regulators because we're not regulators.  We're law

4  enforcement.

5           THE COURT:  Right.

6           MR. SWEET:  They'll do their thing and the Bank will

7  have its opportunity to engage with a regulator about this

8  conduct and they'll go from there.

9           THE COURT:  Without pointing any fingers or throwing

10  any stones, this isn't the kind of thing that a 22-year-old

11  loan officer trainee can say, "Yeah," you know, "this, let's

12  set up this account."  This has to go up the food chain,

13  doesn't it, in the Bank?

14           MR. SWEET:  Your Honor, this was managed at a very

15  high level at the Bank.

16           THE COURT:  Right.  I mean, you don't get the guy in

17  New Accounts to sit down and say, "Sure, we'll, we'll go the

18  distance with you."

19           MR. SWEET:  It might start that way, Your Honor, with

20  a hungry relationship manager who, who puts some pressure on,

21  the bank secrecy officer to let something slide so they can

22  open an account, but once these things start rolling these are

23  not minor dollar kind of customers.  They're, they're

24  elaborate.  Often, including with this Bank, they require

25  special staffing and procedures for handling all those

```
1   returns.

2           THE COURT:  Do they have a personal contact with

3   anybody downstream, the clearinghouse PPPT or the payday

4   lender?  Does a guy come in and say, "Let's get lunch down at

5   the hamburger stand and talk about my trip," or is it all done

6   anonymously?  You don't know.

7           MR. SWEET:  Your Honor, with -- there's -- I can tell

8   you from the various cases I've seen there's, there's all sorts

9   of relationships.

10          THE COURT:  Uh-huh (indicating an affirmative

11  response.)

12          MR. SWEET:  There's all sorts of relationships.  I --

13  I --

14          THE COURT:  What was the situation here?

15          MR. SWEET:  The situation here -- you're asking, Your

16  Honor, the relationship within the Bank?

17          THE COURT:  Like did the Bank ever physically look at

18  a human being who was the clearinghouse person and who came --

19          MR. SWEET:  Depositor.

20          THE COURT:  Yeah.  -- and came in and sat down and

21  said, you know, "We're, we're so happy to be doing business

22  with you.  This is a nice bank.  I like your town"?  And also,

23  the payday lender guy?

24          MR. SWEET:  Your Honor, I -- with this, I'd request

25  your indulgence to defer to counsel for the Bank.
```

1          THE COURT:  Okay.

2          MR. SWEET:  I, I don't want to go beyond what's in the

3    complaint.

4          THE COURT:  Okay.

5          MR. SWEET:  And we haven't made those allegations in

6    the complaint.  We do have, as I mentioned before, this is, as

7    Mr. Acker mentioned, this is a resolution of the civil part of

8    this case against this Bank.

9          THE COURT:  Yeah.

10         MR. SWEET:  And I'd rather not go any further in terms

11   of discussing other information --

12         THE COURT:  That's fine.

13         MR. SWEET:  -- we may have.

14         THE COURT:  That's fine.  How many of these do you

15   have going?  I mean, is this the only one in the country, or do

16   you have a hundred of them, or do you have a thousand of them?

17         MR. SWEET:  We have several.

18         THE COURT:  Okay.  Is this a big one, or a little one,

19   or medium size, small, pocket change?

20         MR. SWEET:  We're still trying to assess.

21         THE COURT:  Okay.

22         MR. SWEET:  There are, there are banks that we are

23   aware of that have dozens.  There are massive national banks

24   that have, put it this way, more than 25 payment processors

25   where the payment processor's customers are a majority high

1   risk.

2           THE COURT:  Either telemarketer or a payday-lender

3   kind of thing.

4           THE COURT:  Yes.  Or Internet.  Some kind of --

5   whatever the --

6           THE COURT:  Yeah.

7           MR. SWEET:  There's a category -- I think we have them

8   in a footnote, Your Honor, where we describe what, what the

9   banking regulators describe as high-risk merchants.  I -- I --

10      So I want to give Your Honor some scale.  This is not the

11  only case.  It's not the smallest case.  It's not the biggest

12  case, but it's one case, Your Honor, which I can say that Four

13  Oaks Bank when it received our subpoena back in, I believe it

14  was May, I think they came to terms with what was happening and

15  were very forthright in coming to the Government and addressing

16  the problem.  And --

17          THE COURT:  Well, you get a subpoena from the DOJ,

18  that's, that's a little more intense than any of the bank

19  regulators.  I mean, you're used to dealing with the bank

20  regulators and the auditors.  When the guy knocks on your door

21  from Washington and it's got a criminal potential, you take

22  that seriously.

23          MR. SWEET:  Well, I think the Bank did in this case.

24  I think the Bank's conduct once it received a subpoena and how

25  it addressed the investigation at that point is commendable and

1    -- and is -- it's part of the reason we were able to reach this

2    type of agreement, which, which if Your Honor would like me, I

3    can talk about the agreement for a moment, but we believe this

4    is a carefully, narrowly tailored agreement designed to stop

5    prospectively precisely the illegal conduct that we're

6    concerned about that will not affect the Bank's other business

7    and/or its legitimate merchants and customers of which there

8    are many.

9        We believe that the penalty amounts are, are justified by

10   the Bank's ability to pay and we can talk more about that, but

11   we made inquiries and conferred with the state regulators and

12   the Fed who, and we've, we've done an independent financial

13   analysis, and we believe that the penalties are appropriate.

14   They were also within the range of the FIRREA statute.

15       And so between the prospective conduct -- and there is a

16   provision for a management lookback -- the -- we've, we've

17   incorporated industry guidelines, merchant industry guidelines

18   for the return rates and conduct that will have to be driven in

19   the future by return rates and by other indicia of fraud.

20       So we worked very hard with counsel and come up with what

21   we believe is an appropriate consent decree.  And I will

22   mention as well, although I'm not as familiar with counsel from

23   Smith Anderson, Mr. Knowles, who's representing the Bank, is an

24   extremely experienced lawyer in this area with a national

25   reputation and I think that the Bank had extraordinarily good

1   counsel in terms of achieving a result that is good for the

2   public and the Bank.

3           THE COURT:  Why doesn't the Bank just simply

4   terminate all dealings with facilitators?

5           MR. SWEET:  Your Honor, I'll let the Bank speak for

6   itself, if I may?

7           THE COURT:  Yeah.  Okay.

8           MR. SWEET:  Any --

9           THE COURT:  All right.  Thank you for your

10  presentation.

11          MR. SWEET:  Anything further?

12          THE COURT:  I don't know.  I'll --

13          MR. SWEET:  I'll be here.

14          THE COURT:  I'll see.

15      Who's going to, who's going to talk for the Bank?

16          MR. BRINSON:  Your Honor, Cliff Brinson of Smith

17  Anderson.  I'm not the person's who's going to talk.  I just

18  want to introduce the person who is.

19          THE COURT:  Okay.

20          MR. BRINSON:  Jeff Knowles is with the Venable law

21  firm in DC.  He has been handling this matter on behalf of the

22  Bank and his firm since the subpoena was issued and I think

23  would be the person most likely to be able to answer Your

24  Honor's questions.

25      We also have with us, Your Honor, Lisa Herring, who's the

1  Executive Vice President with Four Oaks Bank, and Geoff Adams,

2  who is one of my partners as well

3          THE COURT:  Yeah.  Didn't I have a case involving Four

4  Oaks Bank?  Does your Bank representative remember that?

5          MS. HERRING:  No, I do not remember.

6          THE COURT:  Okay.  All right.  We'll keep looking for

7  it.

8      Mr. Knowles?  Well, do you want to say anything,

9  Mr. Knowles?

10         MR. KNOWLES:  Your Honor, I'd be happy to answer any

11 questions that you have.

12     I'd also be happy to give you some of the context around

13 what this case is going on.  There's a lot to it and --

14         THE COURT:  Why did your company get into this if it

15 was with a bunch of crooks?

16         MR. KNOWLES:  Well, I, I would kind of dispute the

17 characterization because it's a much more complex process and

18 if I could, Your Honor, just step back for a minute and give

19 you a little bit of just history here.

20         THE COURT:  Well, payday lenders go back to Al Capone,

21 you know.  I mean, it's -- that was the idea --

22         MR. KNOWLES:  They -- they --

23         THE COURT:  -- you know, loan sharking, they called

24 it.

25         MR. KNOWLES:  They do, but it's a little different

1   than that.

2           THE COURT:  They used to call it "loan sharking."  Now

3   they have a more elaborate description.

4           MR. KNOWLES:  You're right, but there's a difference,

5   you know.  This industry is also called small-dollar loans.

6           THE COURT:  Yeah.

7           MR. KNOWLES:  And it's very difficult for a lot of

8   working people to go to a bank, to go to a Wells Fargo or a

9   local bank and get a small loan, a $500 loan.  This is an

10  industry that sprung up because there's a real need and, in

11  fact, when the Federal Government shut down in Washington there

12  were stories about government employees going out and getting

13  payday loans.  There are a number of reasons why working people

14  can't get access.  They have that.

15      So there's a real need for the service.  The question is

16  how that need that people have for small short-dollar loans, to

17  fix a car, do something else, all those things that are

18  serviced.  And there are -- and I think Mr. Sweet pointed this

19  out -- lawful payday lenders, storefront lenders, and others

20  who are complying with all the relevant state and federal laws

21  in the area.

22      So I think the point that Mr. Sweet was making is that the

23  Department of Justice is not trying to throw the baby out with

24  the bath water.

25          THE COURT:  It -- it --

 1          MR. KNOWLES:  They're trying to get the bad actors out

 2     of this.

 3          THE COURT:  It's tough to put a good face on predatory

 4     lending, though.  I mean, that's -- this is going to be a hard

 5     sale here, you know?

 6          MR. KNOWLES:  Well, I'm not going to, I'm not going to

 7     try to explain.  I think it would take a long time to give you

 8     a full discourse on, on that.  So I won't do that, but there

 9     are some points that I do want to make, Your Honor.

10        This is a fair settlement that was carefully negotiated and

11     entered into, as Mr. Sweet said.  And I'm happy to answer any

12     questions about the settlement, itself, but I do want to just

13     make a couple of comments about the Bank, itself.

14          THE COURT:  Well, if you're not doing it anymore and

15     if you've knelt down and asked for forgiveness, why do you need

16     to have any sort of agreement at all?  Why don't you just --

17          MR. KNOWLES:  Well, that's -- that -- that's a good

18     question.

19          THE COURT:  Why don't you just give it up?

20          MR. KNOWLES:  That's a good question.  The fact of the

21     matter is before this subpoena came from the Department of

22     Justice and they came in -- and, Your Honor, in Washington we

23     deal with, our area, we do a tremendous amount of enforcement

24     work dealing with government investigations across the entire

25     spectrum of the Federal Government as well as State Attorney

1 Generals and we enter into many settlements for cases for many

2 different reasons.

3     But an important fact that you should be aware of is that

4 the Bank tried to terminate this agreement in the fall of 2012.

5        THE COURT:  And the payday lenders wouldn't let them?

6        MR. KNOWLES:  Would not let them.  And part of the

7 problem was -- and so well before the --

8        THE COURT:  Did --

9        MR. KNOWLES:  -- Department of Justice --

10        THE COURT:  Did they threaten --

11        MR. KNOWLES:  -- ever showed up --

12        THE COURT:  Did they threaten their lives?  Did they

13 send --

14        MR. KNOWLES:  That's exactly --

15        THE COURT:  -- some of the --

16        MR. KNOWLES:  That's exactly --

17        THE COURT:  -- some of the "boys" over?

18        MR. KNOWLES:  -- what happened.  That's exactly what

19 happened.  Unfortunately --

20        THE COURT:  So it is the mob?

21        MR. KNOWLES:  --  and we, we were not counsel at the

22 time, nor was --

23        THE COURT:  It is the mob.

24        MR. KNOWLES:  -- Smith Anderson -- but when we gave

25 notice of termination the third-party payment processor took

1  strong exception to that --

2          THE COURT:  And said, "You're in it for the life."

3          MR. KNOWLES:  You said, "You're stuck," and the

4  contract, unfortunately, looked more like a straitjacket.  And

5  -- but the Bank very much wanted to extricate itself from that

6  relationship.

7          THE COURT:  They sent you the collected series of The

8  Sopranos so you could watch all the years from --

9          MR. KNOWLES:  Well --

10          THE COURT:  -- 1 to 9?

11          MR. KNOWLES:  -- without characterizing it, let's say

12  that the Bank did not continue that relationship happily.  And

13  so it's very clear that long before --

14          THE COURT:  I've never heard of a --

15          MR. KNOWLES:  -- the Department of Justice came by --

16          THE COURT:  I've never heard of a bank being the

17  victim of extortion.  Usually, the bank is the, the source of

18  the extortion.

19          MR. KNOWLES:  Well, this is the case --

20          THE COURT:  They were wearing the wrong hat here.

21          MR. KNOWLES:  Yeah.

22      Two things.  One here, this is a case where the Bank was

23  doing, I think, a good job on due diligence.  Was it perfect?

24  No.  Are there examples that the Department of Justice has

25  cited?  Yes.  But to that point, we do understand the

    1   complexities and these issues have come to the fore really in

    2   the last few years.

    3          THE COURT:  Well, let's indict these payday lenders

    4   here for, for their collusive crimes and extortion and

    5   racketeering.  This is a great RICO case, isn't it?  You're a

    6   U. S. Attorney, right?  You're too young to be a RICO guy, but

    7   I'm old enough to be a RICO.  This is a classic RICO case.

    8          MR. SWEET:  Your Honor, I wrote my, my Law Review Note

    9   on RICO.

   10          THE COURT:  Am I not right?

   11          MR. SWEET:  I, I appreciate your comments.

   12          THE COURT:  About being young?

   13          MR. SWEET:  I'm not sure you're correct about that,

   14   but I, I generally don't want to --

   15          THE COURT:  But the RICO --

   16          MR. SWEET:  -- sound --

   17          THE COURT:  -- application is spot on, isn't it?

   18          MR. SWEET:  Your Honor, I think that's something that

   19   is worthy of consideration.

   20          THE COURT:  Is Blakely still alive?  That --

   21          MR. SWEET:  I don't believe so.

   22          THE COURT:  You don't think so.  I think he died.

   23          MR. SWEET:  He was at Notre Dame.

   24          THE COURT:  Yeah.

   25          MR. SWEET:  And I don't --

```
1              THE COURT:  He wrote the law.

2              MR. SWEET:  Yeah.  And I, I don't think he is --

3              THE COURT:  Yeah.

4              MR. SWEET:  -- unfortunately.

5              THE COURT:  Yeah.

6              MR. SWEET:  But --

7              THE COURT:  Yeah.

8              MR. SWEET:  But it was a brilliant law when it was

9   written.

10             THE COURT:  Yeah.

11             MR. SWEET:  And it's got some --

12             THE COURT:  I actually tried some criminal RICO cases.

13  They're --

14             MR. SWEET:  Your Honor, I hear what you're saying and

15  I'll make sure that this, your commentary --

16             THE COURT:  It's still a law, isn't it?  It -- it's --

17  it hasn't been repealed, has it?

18             MR. SWEET:  No.

19             THE COURT:  No.

20             MR. SWEET:  No.  As a matter of fact, Your Honor --

21  and this is --

22             THE COURT:  They, they get to take the bank under

23  RICO.  I don't know if you've had experience with it.

24             MR. SWEET:  I -- I am --

25             THE COURT:  You just --
```

1          MR. SWEET:  I am old enough to have had --

2          THE COURT:  You, you give it all up, right?

3          MR. SWEET:  -- quite a bit of experience with RICO and

4    I don't think that the facts in this case warrant RICO.

5          THE COURT:  No, I know.

6          MR. SWEET:  Your Honor, not referring to this Bank at

7    all or this investigation at all, purely as a theoretical --

8          THE COURT:  Theoretical, yeah.

9          MR. SWEET:  -- response to what you've discussed, what

10   you just mentioned, the RICO statute does have a specific

11   identifiable provision.

12         THE COURT:  Predatory --

13         MR. SWEET:  It is, it is a RICO violation to collect

14   an unlawful debt and -- and there -- once you have that, a lot

15   of the other provisions drop away.

16      So I will, I will point that out that there are issues

17   there that you raise and I think consider, are worthy of

18   consideration.

19         MR. ACKER:  There are also statutes, Your Honor, that

20   prohibit, federal statutes that prohibit lenders from engaging

21   in certain loan practices or similar practices if the State

22   requires a license to participate in those without a license.

23   And that is, certainly, another avenue that is being explored.

24         THE COURT:  Don't you wish I had just signed this

25   thing yesterday and it never saw the light of day, just sort of

1  flew through the hallway?

2       MR. KNOWLES:  No.  What -- I do agree with what the

3  Government said, Your Honor.

4       THE COURT:  Okay.

5       MR. KNOWLES:  We certainly want to make sure you're

6  comfortable with all the facts --

7       THE COURT:  Sure.

8       MR. KNOWLES:  -- and that you are able to get answers

9  for any questions you have.

10     I would note, you know, a couple of different points just,

11  you know, quickly.

12     You can debate the merits of the industry.  Clearly,

13  there's a need for people to get access to money and the rates,

14  interest rates are, you know, that's an issue, but Four Oaks,

15  you know, in this situation, this is something that's come to

16  attention really in relatively recent years.  The Wachovia case

17  in 2008, which led to a very large, $160 million, $150 million

18  civil penalty, one of the largest that OCC had ever meted out,

19  I was involved in that case because we later represented

20  Wachovia and some of their executives, but I also was involved

21  in some of the underlying merchants that led to that particular

22  OCC penalty.

23       THE COURT:  In 2008 --

24       MR. KNOWLES:  This --

25       THE COURT:  -- Wachovia wasn't worth, given $2 to --

1  its stock had gone from 70 to nothing.

2            MR. KNOWLES:  It had, but it was still a major case at

3  the time.  And the point is that there's been an increased

4  amount of attention that the Government has put on this because

5  of -- there's a group called the Federal Financial Fraud

6  Enforcement Task Force coordinated by the Department of Justice

7  with an array of all the banking agencies that you talked about

8  and they have in the last few years really begun to focus on

9  third-party payment processors and their role.  And the

10  Government's investigation has been dubbed "Operation Choke

11  Point."  And the idea behind it, Your Honor, is to try to close

12  off access to the U. S. financial system by putting pressure on

13  third-party payment processors and banks that deal with third-

14  party payment processors.

15      And so every bank in the country, large and small -- this

16  is not a problem of banks like Four Oaks alone.  We could be

17  talking about Wells Fargo, JPMorgan Chase, BMO Harris, any

18  number of other banks.  And so it's a problem, generally.  The

19  awareness, the reputational risks, financial risks, legal risks

20  are, those issues have been there, but the particular focus and

21  the awareness now is greater than ever.  Cases like JPMorgan,

22  they're well publicized and the need to, you know --

23            THE COURT:  They just coughed up a couple of billion

24  to --

25            MR. KNOWLES:  Absolutely.

1          THE COURT:  -- to the Ponzi --

2          MR. KNOWLES:  That's right.  And they went through

3   their commercial customers, just as Mr. Sweet said.  They have

4   gone through and looked at their commercial accounts and

5   they're getting rid of a number of high-risk commercial

6   accounts.

7          So this awareness is really coming lately.  The Government

8   is driving it.  All the regulators are driving it.  DOJ as a

9   law enforcement agency is pushing that agenda.  There's very

10  close coordination among all the government agencies, Federal

11  Trade Commission, Consumer Financial Protection Bureau, and so

12  forth, but the industry as well.  Banks are paying attention to

13  this.  They are responding.  When Four Oaks became aware of

14  this, before the Department of Justice arrived, they wanted to

15  do the right thing.  They were very concerned that if they

16  wound up in protracted litigation with this particular third-

17  party payment processor, that it could damage the Bank and

18  ultimately create massive financial liability for the Bank

19  because of the way the original contract was written.  But they

20  understood that.  They wanted to get out and as part of the

21  agreement they would be terminating that relationship.  But

22  that's not an understanding that was reached just because of

23  the Government's actions.

24         The Bank wanted to get out of this, you know, going back to

25  the fall of 2012 and, in fact, at the time the Bank entered

1  into business with this particular third-party payment

2  processor the relationship changed over time.  And one of the

3  things with third-party payment processors, they may have as

4  their merchant base -- they have merchants or clients of their

5  own -- and they could have had a thousand drycleaners or a

6  thousand liquor stores or a thousand restaurants.

7           THE COURT:  Yeah, but this one had 99.9 percent of

8  payday lenders.

9           MR. KNOWLES:  It changed over time and the nature of

10  the merchants that that third-party payment processor was

11  servicing changed over time.

12     So it began to change and as it began to change over time,

13  Your Honor, the Bank became increasingly more uncomfortable

14  with the relationship and concluded on its own in the fall of

15  2012 that it wanted to terminate that relationship.  Department

16  of Justice understands that.  We've had many conversations

17  about it.

18     So the Bank has today -- hindsight is perfect.  We all know

19  that -- the Bank has a much clearer understanding today of what

20  the concerns are that the Government has, what the potential

21  harm is to consumers from a consumer injury standpoint, and I

22  think the Bank acted, you know, at the time in accordance with

23  standards that were out there.  You know, using hindsight as

24  the test, though, clearly the Government has raised the bar

25  across the board.  All the regulators are raising the bar.

1    OCC, FDIC have put out, you know, guidance documents and so the

2    bar's been raised.  Hopefully, the financial services industry

3    is paying attention.  I know that Four Oaks is paying

4    attention.

5        And so we think that this settlement is a good way to bring

6    this issue to a close, to allow the Bank to move forward.  The

7    Bank is getting out of the payment processing business

8    entirely.  And so over a phased period they're dropping one

9    particular payment processor and within the next year another

10   payment processor they're working with, they will terminate

11   that relationship as well and they're very, you know, there are

12   specific requirements in the agreement dealing with that other

13   payment processor.

14       But we think this is a good settlement.  We think it's a

15   fair settlement.  We hope you'll approve it, Your Honor.  And,

16   and if you have more questions, please feel free to ask.

17            THE COURT:  No.  Thank you.

18            MR. SWEET:  Your Honor, if I may, there was one

19   statement I'd just like to make with regard to that last issue

20   that Mr. Knowles raised.

21       The Bank has that decision to get out of the entire

22   business and will be phasing out other relationships, but under

23   the provisions of this consent decree the particular payment

24   processor fits into the -- would be -- would be terminated

25   under the consent decree.  It's -- the moment that it's entered

1 and becomes effective, that particular payment processor that

2 the case is based upon is gone. The processors that

3 Mr. Knowles talks about, or the one processor is there is

4 really -- there are mechanisms here, very stringent mechanisms

5 to assure that that processor does not engage in the kind of

6 conduct that we're concerned about that could be harmful to

7 consumers.

8 So although Mr. Knowles said there's a gradual getting out

9 of that business, consumers will be protected as of the entry

10 of this consent decree due to the other provisions. I can

11 point them out, if Your Honor is interested, but we're leaving

12 no risk to consumers once, once this is entered because the

13 existing payment processor will be, really, fenced in in a way

14 that, I think, the public will be protected.

15 THE COURT: Well -- go ahead.

16 MR. ACKER: Your Honor, I just had one other small

17 matter to address in the consent, or the proposed consent order

18 on Page 14, bottom of Page 13 and onto Page 14. One of the

19 requirements is for the Bank to submit to the court the name of

20 an outside counsel that the Bank has agreed should conduct an

21 internal investigation and make recommendations to the board of

22 directors. And the way this is written, the court would need

23 to approve that attorney.

24 I don't know that the Bank is prepared to name that person

25 now. If so, it may be that Your Honor could approve that as

1    part of this order with no further action necessary.  I don't

2    know.  The provision in the agreement says that it's done

3    within 30 days, but if the Bank's prepared to do that we may be

4    able to resolve that today.

5            MR. KNOWLES:  Yes, Your Honor.  The Bank is prepared

6    to ask the Venable law firm and to ask me, in particular, to

7    handle that investigation that's called for in the order.  The

8    Bank is comfortable with Venable conducting that review and if

9    the Department of Justice has no objection to that, the Bank

10   would like to put forward my name and my firm to conduct that

11   review.

12           THE COURT:  You don't have a conflict of interest in

13   doing that?

14           MR. KNOWLES:  We don't feel that we have a conflict of

15   interest in doing that, Your Honor.  We feel that we have --

16   one of the things that I think --

17           THE COURT:  You have an attorney-client relationship

18   with the Bank.

19           MR. KNOWLES:  We do.

20           THE COURT:  And you have a fiduciary relationship with

21   them as a result of that.

22           MR. KNOWLES:  Right.  But all --

23           THE COURT:  The only --

24           MR. KNOWLES:  -- we would be doing is making

25   recommendations to the Bank's board of directors with regard to

1    the underlying conduct and any personnel decisions that would

2    be made.

3              THE COURT:  But you don't pretend to be impartial?

4              MR. KNOWLES:  No.  We are the Bank's counsel, that's

5    correct.

6              THE COURT:  Yeah.

7              MR. KNOWLES:  But we do have a deep knowledge of the

8    facts, the underlying facts and involvement and I think it

9    would be far more expensive for the Bank to bring in outside

10   counsel.  We are not regular counsel for the Bank.

11             THE COURT:  Right.

12             MR. KNOWLES:  We were hired as special counsel for

13   this matter.  The Smith Anderson firm is their, is the Bank's

14   outside general counsel.

15             THE COURT:  And what are you going to do?  Do an

16   analysis and an audit of their lawfulness?

17             MR. KNOWLES:  No.  What we would do -- I think -- the

18   purpose of this is, really, twofold in the agreement, as I

19   understand, and Mr. Sweet can comment on this.  One is to make

20   sure that the particular conduct at issue does not occur in the

21   future.

22             THE COURT:  Suppose it does?  Then what do you have --

23   what's your duty?  Aren't you put between the devil and the

24   deep blue sea?  I mean, suppose you get in there and you find

25   that there's something objectionable going on.  Do you have to

1  withdraw then or --

2          MR. KNOWLES:  No.  I think what we would be asked to

3  do under the agreement is to make recommendations to the Bank's

4  board of directors with regard to changes in conduct or

5  activity or personnel.

6      So we would be doing that.  We would be reporting to the

7  Department of Justice on any changes in personnel.  It would be

8  a --

9          THE COURT:  Even if they're unfavorable to your

10 client?

11         MR. KNOWLES:  Pardon?

12         THE COURT:  Even if, if they are unfavorable to your

13 client?

14         MR. KNOWLES:  Well, individuals involved, for example,

15 if particular employees were interviewed or otherwise, they

16 would retain their own counsel.  So they would be represented

17 separately by their own counsel.

18         THE COURT:  What, what is it about ethics that I am

19 concerned about that no, that -- why am I the only one who sees

20 this as a problem?

21     Do you see it as a problem?

22         MR. SWEET:  Your Honor, we've discussed this with

23 Mr. Knowles earlier.  We, we recognize the potential.  We also

24 recognize the financial ties between the Bank -- let me step

25 back for a moment.

1     This is not a case where we've tried the case or the firm

2 has taken positions that everything was hunky-dory and

3 everything's fine and nothing, nothing happened.  So the

4 Bank -- the attorneys for the Bank have -- the process they

5 have had is, for the most part, to disclose information and try

6 to explain the information and advocate for, for the client's

7 interest without denying the conduct.  I'm not, as it's a

8 formal matter.

9     So we're not in a position where we doubt the firm's

10 ability to perceive what occurred here and make recommendations

11 to the board of directors for action.  We have confidence the

12 Bank can do that or the firm can do that and we also recognize

13 that the firm has already a deep understanding of the facts --

14          THE COURT:  Yeah.

15          MR. SWEET:  -- and has been probing the facts.  So

16 there is some efficiency to it as well.

17          THE COURT:  Yeah.

18          MR. SWEET:  Your Honor, we don't, we're not going to

19 take a position on this.  We're not going to object if Your

20 Honor believes that the Venable firm and Mr. Knowles are

21 adequate to fulfill that, that purpose.  This is the Bank's

22 recommendation to Your Honor.  The Government's not going to

23 object.  We do understand what you're raising, but in these

24 particular circumstances we don't, we would not object on the

25 basis of their existing relationship.  As Mr. Knowles mentioned

1  as well, they're not regular counsel for the Bank.  They were

2  brought in for this specific purpose.

3       THE COURT:  Yeah, but they're the Bank's lawyer.  They

4  have a professional obligation to seek the best interest of

5  their client.

6       MR. BRINSON:  Your Honor, I think the -- as I look at

7  this, this is more of a potential conflict of interest than an

8  actual conflict.  The conflict, this potential would come down

9  the road if there were some recommendation made that wasn't

10 followed by the Bank, or something along those lines and I

11 think that the, the law firm is taking a risk that if that

12 potential conflict ripened into an actual conflict, they might

13 be conflicted out of future representation of the Bank.

14      THE COURT:  You call it a "potential."  I call it the

15 appearance of a conflict.  There's -- the appearance is there

16 that there's a conflict.

17      MR. SWEET:  Your Honor, if I may, if we can then let

18 this particular provision sit.  'Cause under this agreement the

19 Bank has 90 days to or --

20      MR. ACKER:  Up to 30 days.

21      MR. SWEET:  -- 30 days to recommend and the Bank can

22 submit papers in a brief and justification for why they believe

23 whatever appointment they decide would --

24      THE COURT:  Yeah.

25      MR. SWEET:  -- be appropriate.

1          THE COURT:  All right.

2          MR. SWEET:  And it doesn't have to be decided now.

3          THE COURT:  Okay.

4          MR. SWEET:  It was just a possibility if Your Honor

5   wanted to entertain that issue now.  You raise some issues

6   that, I think, we may want to take a closer look at it, too,

7   but --

8          THE COURT:  Okay.

9          MR. SWEET:  -- I'll leave it at that.

10         THE COURT:  Okay.  Thank you.

11      Thank you all for a very thorough handling of the facts of

12   the case and I'm grateful to hear all the information that I

13   heard and I will look at the injunction and see about entering

14   it.

15      So anyway, thank you.  This was worthwhile.

16         MR. BRINSON:  Thank you,  Your Honor.

17         MR. SWEET:  Thank you, Your Honor.

18         MR. KNOWLES:  Thank you, Your Honor.

19         THE COURT:  We'll be in recess.

20         THE COURTROOM DEPUTY:  All rise.  Court will be in

21   recess.

22      (Proceedings concluded at 11:33 A.M.)

23

24

25

1

2                    CERTIFICATE OF COURT-APPROVED TRANSCRIBER

3              I, Janice Russell, court-approved transcriber, in and

4    for the United States District Court for the Eastern District

5    of North Carolina, do hereby certify that pursuant to Section

6    753, Title 28, United States Code, that the foregoing is a true

7    and correct transcript from the official electronic sound

8    recording of the proceedings in the above-entitled matter and

9    that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12                         Dated this 21st day of January, 2014.

13

14

15                         /s/ *JANICE RUSSELL*
                           JANICE RUSSELL
16                         COURT-APPROVED TRANSCRIBER

17

18

19

20

21

22

23

24

25